# Exhibit 6

# UNITED STATES CAPITOL POLICE
WASHINGTON, DC 20510-7218

December 10, 2000



## MEMORANDUM

**TO:** Chief James J. Varey

**FROM:** Sergeant Frank Adams

**SUBJECT:** K-9 Selection Process/Racist Environment - Patrol Division

In keeping with your stated desire to have open lines of communication throughout the chain of command and in an effort to provide you with information which will better enable you to assess and remedy the problems which exist on Patrol Division, the following analysis is provided:

### The Canine Unit

Discrimination against Minorities - (Black and Female officers)

The United States Capitol Police Department's K-9 unit appears to selectively exclude black and female officers from its ranks. Currently the unit has one black and no female handlers assigned. This statistic obviously does not reflect the diverse society in which we live, nor is it representative of the diversity of this Department.

In the most recent K-9 selection process, Officer Ikard and Officer Webb, two black officers who are currently assigned to Patrol Division, competed in the process for a K-9 position. Officer Ikard and Officer Webb finished the process ranked #12 and #15, well behind candidates from other Divisions who had few if any of their qualifications.

The vacancy announcement for the K-9 selection process summarized a K-9 handler's duties as **"providing routine police patrol duties** and explosive detection capabilities for the USCP." Both Officer Ikard and Officer Webb are very knowledgeable in arrest procedures, vehicle stops, D-checks, court procedures, alarm responses, reports specific to patrol duties, procedures for transporting prisoners to D.C. General, CCB, juvenile facilities and all other routine patrol functions. Their qualifications in this regard far exceeded the other candidates and precludes them from the necessity of undergoing the FTO training required for all newly assigned officers to Patrol Division.

Officer Ikard in particular, had an Annual Performance rating at the time of the K-9 selection process which reflected that he is exceptional in the categories of human relations, acceptance of responsibility, and performance of duty. He also received a maximum rating from his supervisors in response to the K-9 evaluation form. It is hard to fathom how Officer Ikard could finish the K-9 process ranked behind 11 officers who lack most, if not all, of his attributes. Instead of the appropriate weight being placed on Officer Ikard's assets, he was instead questioned by ███████████████████████ during the interview process, about his sick leave record of 10 years ago.

The United States Capitol Police K-9 selection process appears also to be negatively skewed against female officers. Female officers are generally eliminated from the process based on physical standards which have little or no relevance to whether or not they can competently function or excel as K-9 handlers. It is unconscionable that Department administrators have allowed this discriminatory practice to continue. The effect has been that many qualified female officers are being denied a legitimate opportunity to achieve their occupational, professional, and economic aspirations.

It is not advocated that the qualifications or standards for K-9 handlers be lowered for any group, but instead, that the testing process is made valid. A valid test would measure qualities which identify officers with the potential of excelling in the following routine K-9 duties formally identified in an announcement for that position:

1. Conducting explosive detection operations, as directed.
2. Searching interior and exterior of buildings or portions there of and examine all modes of transportation.
3. Screening cargo, loading docks, warehouses, parcel pick up, shipping and receiving areas as well as luggage, bags, all types of equipment and any other elements as directed by proper authority consistent with canine training.
4. Assisting other agencies when directed.
5. Being fully responsible for the health, feeding, proper care and actions of assigned canine.
6. Strictly adhering to all Departmental regulations and directives pertaining to canine care and the maintenance of a kennel at assigned officer's residence.
7. Performing other duties as assigned.
8. Conducting routine patrol assignments.

A valid test would also show a positive correlation between the testing criteria, the measured results, and the routine duties of a K-9 handler. The tests in which the candidates are required to (a) hold 30 pound buckets of rocks for 30 seconds, with arms extended in front and elbows locked, and (b) throw a 70 pound bag over a 6 ft fence, have no practical relevance to the routine duties and responsibilities of USCP K-9 handlers and are therefore invalid.

The purported rationalization for using the <u>bucket test</u> is to determine if an officer is strong enough to lift a canine off of the ground, while choking it, in order to gain the canine's obedience when it becomes aggressive. Not only does this archaic training technique constitute

inhumane treatment of animals and abuse of government property, but it is also totally unnecessary due to the wide variety of more appropriate training techniques and methods available. If a canine is too aggressive to be controlled through means other than by choking, then it is perhaps to aggressive to work on Capitol grounds and should be replaced.

The <u>bag test</u>, in which the candidate is required to throw a 70 pound bag over a 6 ft. fence, is apparently suppose to simulate tossing a canine over a 6 ft fence or raising a dog through an elevated window. This is a situation which does not occur on Capitol Hill. These tests appear to remain in place specifically to exclude female officers from the K-9 unit.

It is evident that the United States Capitol Police K-9 unit selects officers based on demographics rather than qualifications. This practice has hurt the excluded class of officers and negatively impacted upon the mission of the Department due to unqualified officers being assigned to the unit. This lack of quality has been repeatedly demonstrated by generally poor attitudes, undisciplined behavior, refusal to accept supervision, and constant, deliberate violations of Department policy and supervisory directives by K-9 handlers.

During the last two years K-9 handlers on PD-1 alone, have committed violations such as using service weapons without reporting use; conducting vehicles stops without notifying the dispatcher; responding to MPD calls without advising dispatcher; taking police action not warranted per G.O. 1000 in the extended jurisdiction zone; pacing vehicles at 80 miles per hour thru the 3rd street tunnel; sleeping on duty; disregarding their assigned duties; misleading the dispatcher in regards to their locations; pursuing vehicles for "<u>traffic only</u>" in violation of Department General Orders and conduct bordering on insubordination (Ironically, when PD-1 supervisors attempted to address these and other problems, they were accused of (1) being non-communicative with the officers and (2) not being "<u>team players</u>").

A clear example of how flawed the K-9 selection process is can be demonstrated by the following fact:

A K-9 handler, presently assigned to Patrol Division, was assigned to the Division in spite an extensive, well documented, disciplinary history in which numerous hours (160 hrs) were taken from him for violations of Department policy, as well as, violations of legal statues for which Patrol Division/K-9 officers are routinely required to enforce. His acceptance on the K-9 Unit would not have happen if the selection process was fair.

The K-9 training facility lacks proper supervision. Officials of the Department were informed by a female rookie (at the time of the allegation), that a K-9 handler who she was riding with as a 10-4 unit during her two week FTO phase on Patrol Division, told her that the K-9 unit did not accept females, and that she would never become a member of K-9 unless she was a "dyke." Since this handler is not in a position to make decisions about who is or isn't accepted into the K-9 unit, it seems highly probable that he was merely repeating what he heard or learned at the K-9 training facility. It appears that the negative, undisciplined attitudes of these officers are developed, cultivated, and reinforced at the K-9 training facility.

*Part of prev memo Chief ~ Army Dec 11,21.*

███████████ has allegedly expressed his dislike for blacks and females, yet the Department allows him to remain in a prominent position from which can exclude blacks and females from the K-9 Unit. A former K-9 handler, presently a Sergeant, stated that ███████ made the following comments to him while he was trying out for the K-9 unit.: "What would you do if I call you a nigger?"

Since beginning this memoranda, it has become extremely evident that the Department sanctions racist behavior especially from Patrol Division's K-9 Unit. Patrol Division, Section One officials previously reported to upper management that a "white" K-9/Patrol Division officer referred to another "white officer" as a "Huk" lover (Huk is a racial slur used to describe blacks). It was also reported to upper management that K-9 officers were observed in possession of a license plate with racial slur "Thanx Huk" on it.

The most recent and blatant act of the Department sanctioning this racist behavior occurred when a PD-2 Roll-Call Sergeant, in the presence of "black" and "white" officers at roll-call, read an official incidental book entry which stated that a newly acquired Department K-9 was named "Huk." The new K-9 (not so coincidently) is a black Labrador Retriever. This announcement was reacted to by several "white" officers in a manner which reflects the racially insensitive environment existing on Patrol Division. The "black" Patrol Division officers who were present at the roll-call, as well as, those who learned later of the "HUK" announcement, were all extremely disappointed and angry.

The process and criteria for selecting officers as K-9 handlers should be reviewed. Greater monitoring and oversight is needed at the K-9 training facility to insure that the things taught there are mission enhancing and not divisive. Officers who are found to be contributing to attitudes and behavior which are detrimental to the good discipline of the Department should be disciplined or re-assigned. K-9 trainers who exhibit sexist and racist behavior should be terminated.

Additionally, K-9 handlers and officers who have been charged and convicted of alcohol related traffic offenses, should not be assigned or allowed to remain in Patrol Division, a position which requires them to enforce violations of the law that they themselves have been convicted of. This is a double standard which should never be allowed in law enforcement.

Finally, it is hoped that Management, especially Patrol Division's upper management team, will began to show interest and a greater leadership roll in addressing these important and potentially volatile issues.

Frank Adams
Sergeant
Patrol Division, Section One

FA:fa:9431
cc: D/C Rohan
    Lt. Dixon